TREG TAYLOR
ATTORNEY GENERAL
Lael A. Harrison (Alaska Bar No. 0811093)
Assistant Attorney General
Alaska Department of Law
P.O. Box 110300
Juneau, AK 99811-0300
Telephone: 907.465.3600
Facsimile: 907.465.3019
Email: lael.harrison@alaska.gov

Justin D. Nelson (Alaska Bar No. 1102007)
Assistant Attorney General
Alaska Department of Law
100 Cushman Street, Suite 400
Fairbanks, AK 99701
Telephone: (907) 451-2811
Facsimile: (907) 451-2846
Email: justin.nelson@alaska.gov
Email: probate.law.ecf@alaska.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| Della Kamkoff, John Andrew, Kayla Birch, Rose Carney, Tereresa Ferguson, Zoya Jenkins, Troy Fender, Rhonda Conover, Autumn Ellanna, and Nataliia Moroz, on behalf of themselves, and all those similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>Heidi Hedberg, in her official capacity as Commissioner of the Alaska Department of Health,<br><br>      Defendant. | Case No.: 3:23-cv-00044-SLG |

**MOTION FOR STAY**

## I. INTRODUCTION

This case involves the State's administration of the federal Supplemental Nutrition Assistance Program ("SNAP" or "food stamps") which is overseen by Federal Nutrition Services ("FNS") within the United States Department of Agriculture ("USDA"). Specifically, this case involves the State's efforts to resolve a backlog in processing SNAP applications that began last fall. The State is currently subject to a Corrective Action Plan ("CAP") with FNS addressing the backlog and is in the process of amending that CAP to add terms regarding the State's timeliness in processing new incoming applications going forward.

For almost a year, FNS has engaged with the State at a granular level, setting and monitoring performance standards of the Division of Public Assistance ("DPA"), within the Department of Health ("DOH"). FNS personnel have traveled to Alaska for week-long site visits three times, hold standing biweekly telephonic meetings with State personnel, and receive weekly data reports from the State. FNS has unique expertise in the administration of the SNAP program and FNS has the power to impose significant monetary sanctions on the State if the State fails to comply with the CAP.

The State expects the process of updating the CAP to be complete within the next six months, likely sooner. The State respectfully requests that this Court apply the doctrine of "primary jurisdiction" and stay this litigation pending completion of that process with FNS. Staying this litigation avoids the inefficiency of parallel proceedings covering the same ground, and avoids the risk of conflicting obligations. If this Court

Case 3:23-cv-00044-SLG   Document 17   Filed 11/09/23   Page 2 of 28

were to enter a preliminary injunction inconsistent with the CAP, or that in any way jeopardizes the State's ability to comply with the CAP, the State would find itself in the impossible position of risking violating this Court's order and being subject to contempt of court, or risking violating its CAP with FNS and being subject to severe monetary sanctions.

Given the active, parallel administrative proceeding, and given the State's demonstrated commitment to resolving the backlog while this case has been stayed, this Court should stay this case for a maximum of six months to allow the State to finalize the CAP with FNS. Once the CAP is finalized, litigation can resume in this case with clear information regarding the CAP requirements, and with the benefit of FNS's expertise already applied to the complex issues in this case.

## II.     FNS AND THE SNAP PROGRAM

SNAP is a federal program administered by the states. Federal money funds the benefits that individuals receive, and the federal government also pays for half of the State's costs in administering the program.

The SNAP program began with the Food Stamps Act of 1964. It has since been renamed SNAP, and the current version of the Act is codified at 7 U.S.C. §§2011-2036 ("the SNAP Act"). The SNAP Act authorizes the Secretary of the USDA to design and administer the program, and to issue regulations.[1] Congress retains an ongoing level of

---

[1]     The Secretary delegated this power to FNS at 7 CFR §271.3.

authority over the program: the SNAP Act states that "prior to issuing any regulation, the Secretary shall provide the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition and Forestry of the Senate a copy of the regulation with a detailed statement justifying it."[2]

### A. THE SNAP ACT PLACES NUMEROUS OBLIGATIONS ON STATE AGENCIES.

The SNAP Act itself contains lengthy requirements for state agencies administering the program. This includes requirements that the agency process all new SNAP applications, and all renewal SNAP applications, within 30 days of receipt. It also provides for issuance of an expedited, short-term benefit to applicants meeting certain criteria to provide coverage until the final decision on their application has been reached. The SNAP Act requires the agency to process and issue those expedited benefits within seven days of receipt of a qualifying application. The SNAP Act also contains numerous provisions regarding verifying information provided in the application, including a requirement that the agency conduct a face-to-face or telephonic interview with each applicant before issuing the benefit.[3] Finally, the SNAP Act also requires agencies to ensure that people can apply for SNAP on the same day that they first contact the

---

[2]     7 USC §2013(c).

[3]     7 CFR §273.2(e) and CFR §272.7(d)(6).

agency.[4] Federal regulations flesh out and augment the many requirements for state agencies found in the SNAP Act.[5]

## B. ROLE AND AUTHORITY OF FNS.

### i. FNS'S APPROVAL AUTHORITY.

The SNAP Act gives FNS a powerful oversight role in monitoring state agency compliance with the law and regulations. Before a state can participate in SNAP, it must submit a plan to FNS for approval, and, once participating, the state agency must notify FNS of any major changes to the plan. 7 USC 2020(e). The SNAP Act also gives FNS the authority to require additional reports and information from the State, and the regulations do in fact require significant ongoing reporting by all participating states.

### ii. FNS'S ENFORCEMENT AUTHORITY.

The SNAP Act also gives FNS powerful enforcement authority:

> If the Secretary determines…that there is a failure by a State agency without good cause to comply with any of the provisions of this chapter, the regulations issued pursuant to this chapter, [or] the State plan of operation…the Secretary shall immediately inform such State agency of such failure and shall allow the State agency a specified period of time for the correction of such failure.

If the State fails to correct the error within the specified period, the SNAP Act empowers the Secretary to withhold federal funds from the State and to seek an injunction through the Attorney General.

---

[4]     7 CFR § 273.2(c)(2)(i).

[5]     7 CFR § 271.1 - §277.18.

### III. FNS HAS BROAD DISCRETION IN CRAFTING CAP'S.

Federal regulation further details the authority and powers of FNS. Under CFR §272.3, FNS has the power to waive statutory and regulatory requirements under certain circumstances, including when "FNS determines that the waiver would result in a more effective and efficient administration of the program." CFR §275.3, entitled "Federal Monitoring" fleshes out the process for FNS to bring a non-compliant state agency into compliance. It recognizes that not all problems will be immediately correctable, and takes that into account by creating the CAP process:

> Any deficiencies detected in program or system operations which do not necessitate long range analytical and evaluative measures for corrective action development shall be immediately corrected by the State agency. Within 60 days of receipt of the findings of each review established below, State agencies shall develop corrective action addressing all other deficiencies detected in either program or system operations.

The regulation requires regular monitoring and periodic "comprehensive" assessments by FNS to determine if the state agency is implementing the CAP, whether completion dates are being met and whether the corrective actions are effective. The regulation also requires FNS to conduct on-site reviews "as frequently as considered necessary to ensure that State agencies are implementing proposed corrective actions within the timeframes specified."

CFR §275.16 specifically addresses situations in which an agency has multiple deficiencies and calls for the CAP to prioritize those deficiencies for corrective action. It also requires the state agency to "coordinate actions in the areas of data analysis, policy

development, quality control, program evaluation, operations, administrative cost management, civil rights, and training to develop appropriate and effective corrective action measures."

## IV.    FNS HAS THE DISCRETION TO SEEK INJUNCTIVE RELIEF OR WITHHOLD FEDERAL FUNDING.

The regulations also provide the process for FNS to invoke its enforcement options of withholding federal funding and seeking injunctive relief. "FNS has the discretion to determine in each instance of noncompliance, whether to seek injunctive relief or to suspend or disallow administrative funds. FNS may seek injunctive relief and suspend or disallow funds simultaneously or in sequence." The regulations set out an advance warning process at §276.4(d). The regulations also give FNS the discretion to "suspend" federal funds and release them upon satisfactory performance by the state, or to disallow the federal funds entirely. And the regulations, at 7 CFR 276.5(b), also provide a process for FNS to refer the matter to the US Attorney General with a request to seek injunctive relief to require compliance.

In addition to regulations, FNS regularly issues nationwide guidance documents to promote consistency in interpretation and administration across the states. These documents are also used to advise the states of impending actions or changes. Once such example is the August 2, 2023 letter to all state SNAP agencies advising them of the steps

FNS was going to take to ensure application processing times were in compliance with regulations and advising of a change to the procedures for escalation of discipline.[6]

In conclusion, Congress has placed monitoring and enforcement of state agency compliance with the terms of the SNAP Act squarely in FNS's domain and has given FNS powerful tools in aid of both monitoring and enforcement.

## V.    THE SNAP BACKLOG IN ALASKA AND FNS INVOLVEMENT

### A.    ALASKA'S SNAP PROGRAM AND THE BACKLOG.

The Alaska Division of Public Assistance (DPA) within the State Department of Health (DOH) is the agency responsible for administering Alaska's SNAP program. The same agency also administers Medicaid and a host of smaller public benefits programs, including Adult Public Assistance; Family Nutrition Program; Child Care Assistance; Chronic and Acute Medical Assistance; General Relief; Heating Assistance Program; Senior Benefit; Temporary Assistance; and Medicaid.

In the fall of 2022, DPA began to fall behind in processing SNAP applications. With the benefit of hindsight, DOH has identified the primary underlying causes of that failure as being the effects of the unwinding of emergency SNAP regulations when the COVID-19 public health emergency expired, lack of staffing, the unusual timing of the 2022 Permanent Fund Dividend payment, and a 2021 cyberattack[7]. During the height of

---

[6] Exhibit 1 - August 2, 2023 Letter from FNS to all state agencies advising of a change to discipline escalation procedures and application processing timeliness oversight.

[7] Exhibit 2 – April 2023 Corrective Action Plan and Unwinding Plan identifying root causes of deficiencies.

the backlog crisis, many DPA offices that had closed during the COVID-19 pandemic had not yet reopened, and DPA's statewide telephone line (the "Virtual Contact Center" or "VCC") was overwhelmed.

### B.   ALASKA'S EFFORTS TO ADDRESS THE BACKLOG.

In December of 2022, the Governor appointed a new Commissioner of DOH, defendant Heidi Hedberg, and Commissioner Hedberg appointed a new Director of DPA, Deb Etheridge, in January 2023. Throughout the legislative session, Commissioner Hedberg and Director Etheridge appeared before the legislature to address the problem and the resources required to resolve it. The legislature appropriated funding both for the then-current fiscal year and for the following fiscal year to allow DPA to hire additional staff, contract out staffing for its Virtual Contact Center (VCC), contract with a consultant to redesign its staffing and workflow patterns, among other things. The Governor also directed a one-time grant of 1.7 million dollars to the Food Bank of Alaska to assist with food security while DPA worked to resolve the backlog. The State did not downplay or minimize the seriousness of the problem, and both the executive and legislative branches came together to address it.

### C.   FNS INITIATION OF CORRECTIVE ACTION PLANNING.

On February 9, 2023, FNS formally initiated a process to create a Corrective Action Plan ("CAP"). That letter recited that as of January 5, 2023, DPA had a total backlog of about 19,000 SNAP applications and recertifications. The letter gave specific recommendations to DPA on how to approach the backlog as well as ways for DPA to

make it easier for Alaskans to apply for SNAP benefits. The letter also required the state to being obtaining and reporting quantitative data on the backlog. The letter stressed the importance of this data both to design the CAP and to monitor the State's progress under the CAP.[8]

DPA provided a draft CAP to FNS on March 1, and FNS responded with comments on March 13. DPA re-submitted a new draft CAP with changes to reflect FNS's comments on March 23. FNS again responded with comments on March 31, and DPA again re-submitted a new draft CAP with changes to reflect the comments on April 10. On April 25, 2023, FNS formally accepted the April 10 CAP.

The final CAP, attached hereto as an exhibit, is a highly detailed document, which sets specific benchmarks for DPA to meet, and also requires specific actions by DPA.[9] It addresses both the backlog and measures to make it easier for Alaskans to apply for SNAP benefits. It sets out a high-level plan to reduce the overall backlog by at least 3% week over week. It also contains granular-level specifics, such as DPA's plan to create a backlog team ideally staffed by 30 eligibility technicians, and a current work team ideally staffed by 79 eligibility technicians. It addresses specific measures for increasing DPA staffing, filling vacancies, and training new hires. It also reflects the back-and-forth between DPA and FNS in addressing the various topics.

---

[8]     Exhibit 3 – February 9, 2023. Letter from FNS to Commissioner Hedberg advising that Alaska was required to submit a corrective action plan.

[9]     See Exhibit 2.

## D.     DPA'S EFFORTS TO IMPLEMENT THE CAP.

Beginning on February 16, 2023, and continuing through the time of filing, DPA has submitted a weekly "backlog tracker" to FNS, quantifying backlog according to several metrics, and reporting the change from prior weeks. Although the format and content has changed somewhat over time, an exemplar from April 27, 2023 is attached as an exhibit.[10] This was generally the format until late July 2023.

DPA proceeded over the next few months to work the commitments that it made in the CAP. DPA implemented a backlog team and current work team, as detailed in the CAP, but each team was seriously understaffed. DPA recruited aggressively and hired new employees, but many months of training are required to learn to process SNAP applications, so none of the new hires were immediately available to begin processing applications. Given the understaffing, DPA prioritized keeping current work up-to-date and not allowing the backlog to grow. When the current work team could not keep up, and new applications risked falling into backlog, the backlog team shifted to current work. Therefore, during this time period, the backlog decreased slowly, but did not increase.

FNS staff visited Alaska during the week of May 1–5, 2023 for a management evaluation process. This process includes meeting with management and staff personally, conducting interviews, reviewing forms and application materials, reviewing training

---

[10]     Exhibit 4 – Alaska SNAP Backlog Tracker report for April 27, 2023.

materials, and other sources of information to allow for a comprehensive program review. This was followed by a series of three separate meetings to discuss the review, which include identification of issues needing correction and technical assistance, as well as review of the CAP. From February to July 2023 DPA has had weekly meetings to check in on progress and offer technical assistance.

### E. FNS CHANGES ITS GOALS FOR THE STATE.

FNS personnel again came to Alaska for site visits during the week of July 17. In the course of these meetings, it became apparent to DPA that FNS was changing its view of DPA's approach to balancing backlog work and current work. FNS personnel became more focused on DPA clearing the backlog faster, and instructed DPA to stop diverting the backlog team to cover current work. In fact, FNS suggested that DPA should divert its current work team to working backlog. At the end of July, FNS instructed DPA to change its weekly reporting to distinguish between backlog cases received before and after April 1, 2023.[11] In early August, FNS issued a clear mandate in writing that DPA would be required to clear all backlog predating April 1, 2023 by September 30.[12] Also, up until that time DPA had been operating under a waiver from FNS of the requirement that DPA interview all SNAP applicants before making an eligibility determination. In that same communication, FNS also made clear that it would allow that interview waiver to expire

---

[11]    Exhibit 5 – August 2, 2023 Email from Director Etheridge to FNS requesting clarification of oral direction to change case processing model.

[12]    Exhibit 6 – August 4, 2023 Email from FNS clarifying their mandated change in case processing model.

*Della Kamkoff et. al. v. Heidi Hedberg*
MOTION TO STAY

Case No. 3:23-cv-00044-SLG
Page 12 of 28

on September 30 and would not renew it. It also made clear that DPA would have to resume verifying certain additional information provided by applicants by August 28.

Based on this instruction, DPA changed its approach and focused on clearing the backlog as quickly as possible. Not only did the backlog team stop doing current work, the current work team did backlog work one day per week and during voluntary overtime. Both teams focused heavily on SNAP, at the expense of DPA's other benefits programs.

DPA's efforts were successful, and DPA cleared the entire pre-April backlog by the end of August. But focusing so much effort on the pre-April backlog meant that DPA got behind on new SNAP incoming applications as well as applications for other programs.

Since then, DPA has been working diligently to stay current with new incoming work and to clear the "new" backlog. However, since FNS required DPA to resume verifying certain applicant information and interviewing applicants, DPA's application processing time has increased. And DPA had to divert the backlog team for several weeks in September to address applications from other programs that were set aside during the push to clear the "old" SNAP backlog.

Since August 2023 the review and technical assistance meetings with FNS have moved to a bi-weekly basis.

### F.    FNS AMENDS ALASKA'S CAP.

On August 2, 2023, FNS issued revised guidance to all state SNAP Agencies advising them of new enforcement escalation procedures and guidance regarding SNAP

Application Processing Timeliness ("APT").[13] This guidance advised states with unsatisfactory APT numbers that a CAP would be forthcoming. On October 5, 2023, the expected letter arrived[14]. FNS informed Commissioner Hedberg that Alaska's CAP would be amended to include metrics and benchmarks for application processing timeliness. The letter required DPA to provide additional data within 30 days related to application timeliness over the prior six months, and requiring DPA to begin reporting timeliness data going forward on a weekly basis. The letter stated that FNS would verify that DPA was collecting the data in accordance with FNS protocol. The letter explained that "FNS will review the data and work with the State to update corrective actions in the existing CAP to improve timeliness."

The letter concluded:

> FNS expects to see measurable outputs that will help the State agency progress towards 95 percent timeliness for SNAP application processing. Once FNS receives the APT rate data, FNS will work with the State agency to set benchmark(s) and associated timeframes for improvement. FNS will take into consideration current State agency initiatives and review current and historical APT data when determining benchmarks. If FNS fails to see measurable progress, an advance warning may be issued in accordance with 7 CFR 276.4.

The State provided its first data reporting on application processing timeliness on October 27. And, in accordance with the existing CAP, DPA provided its semi-annual report on November 1.

---

[13]    See Exhibit 1.

[14]    Exhibit 7 – Letter from FNS to Commissioner Hedberg on October 5, 2023 advising that Alaska would have to enter into a corrective action plan to correct issues with the state's application processing timeliness rate.

It is not clear at this time how FNS will direct DPA to prioritize backlog work versus current work going forward, and how it will consider backlog work in the timeliness benchmarks to be added to the CAP. The letter cites a protocol for calculating a timeliness percentage. Applying this protocol illustrates the significant difference in data reporting that will be produced based on how FNS directs DPA to resolve the backlog. For instance, the more backlog cases that DPA works in a month, the lower its timeliness rate will be. This is clearest when considering August 2023 when DPA made a major push to reduce the backlog. In that month, DPA approved a total of 3,271 initial applications. The majority of those were backlog applications, and so even though DPA approved 972 applications within timeframe, DPA's timeliness percentage by that metric was only 30%. This yields a very different result than calculating what percentage of SNAP applications received in the month of July were approved timely by the end of August. By that metric, DPA's timeliness rate was about 74%. Setting timeliness standards, absent this critical input from FNS, would pose a high risk of inconsistent obligations being imposed on DPA.

It is also not clear whether FNS will waive any requirements going forward. Since declining to renew the interview waiver in August, FNS personnel have indicated FNS may be thawing on that position. DPA made a formal waiver request to FNS for a new interview waiver on November 3, 2023, but has not received an official response.

## VI. PROCEDURAL BACKGROUND OF THIS CASE

The plaintiffs originally filed this lawsuit in state superior court on February 20, 2023. With the complaint, they filed motions for preliminary injunction and for class certification. The motion for preliminary injunction asked the Court to order the State to take specific actions to make it easier to file SNAP applications, to take specific actions related to language access for SNAP applicants and beneficiaries with limited English proficiency, and generally to order the State to process SNAP applications and recertifications on time. Similarly, the motion for class certification asked the Court to certify three classes, one "right-to-file" class, one "language access" class, and one "timeliness" class of SNAP applicants and beneficiaries.

The State received service on February 27 and removed to this Court on March 3. The parties then stayed the case pending settlement negotiations. The parties were unable to fully settle the matter but did stipulate to a six-month stay of litigation on specific conditions. The parties also stipulated to certification of a "right-to-file" class and a "timeliness" class of SNAP applicants. However, the parties reached no agreements regarding the language access claims or on certification of a language access class, and reserved those issues for later resolution.

The conditions of the stay basically tracked the commitments DPA had also made to FNS in the CAP. Over the course of the Stay, the State completed all the conditions set in the stipulation. Specifically, and tracking the paragraph lettering in the stipulation to stay for ease of reference, the State did the following:

1) DPA sought an extension of the waiver of mandatory initial application and certification interviews from FNS, but that request was declined and FNS allowed the waiver to expire on September 30, 2023.

2) DPA fully resumed accepting Telephonic Applications for SNAP benefits through the Virtual Call Center ("VCC") using Telephonic Signatures, as approved by FNS.

3) DPA implemented 12-month SNAP certification periods pursuant to 7 C.F.R. § 273.10(f)(5).

4) DPA maintained 24-month SNAP certification periods for households where all adult members are elderly or disabled with no earned income, pursuant to 7 C.F.R. § 273.10(f)(1).

5) DPA required only the minimum verifications required by federal regulation to open a SNAP case, pursuant to 7 C.F.R. § 273.2(f). However, as of August 28, 2023, FNS increased those required minimum verifications.

6) Similarly, DPA used self-attestation to verify housing costs and utility costs through August, but FNS instructed DPA to discontinue that practice as of August 28, 2023.

7) DPA supplemented staffing on the VCC using private contractors. All 75 contract employees are now fully trained and working on the VCC.

8) DPA worked internally and with a consultant to devise a DPA staffing plan with the goal to ensure adequate employees are available to process SNAP applications within legally required processing timeframes, and DOH has provided information about the staffing plan to Plaintiffs' counsel. That staffing plan, also addressed in the CAP, involves the creation of current work and backlog work teams.

9) DPA monitored usage and wait times of VCC callers and updated Interactive Voice Response ("IVR") prompts to improve efficiency. Wait times for service on the VCC have significantly deceased since the stipulation to stay.

10) DPA has reopened office lobbies Monday-Friday in all offices, although some smaller offices are subject to occasional closure due to approved leave of staff.

11) The parties' attorneys met telephonically with Director Etheridge monthly

to discuss ongoing issues and progress related to the VCC efficiency, hiring efforts, and in-person lobby staffing.

12) DPA continued to mark and register SNAP applications as of the day DPA received them, pursuant to 7 C.F.R. § 273.2(c)(1)(iv).

13) DPA continued to send or provide receipt or written confirmation of initial applications within three business days of being submitted, regardless of how they are submitted.

14) DPA continued to make efforts to process the backlog of applications and recertifications. The Stipulation required DOH to reduce the then-existing backlog by 50% within six months, which directly tracked DOH's commitment in the CAP to reduce the backlog by 3% week-over-week. However, as discussed above, FNS later changed its priorities and required DOH to clear the old backlog at a much faster rate. Therefore, as of August 30, DOH had cleared all applications in backlog at the time of entering into the stipulation to stay. However, a backlog of applications received since the stipulation to stay has accrued since that time, and DOH is continuing to make efforts to process that new backlog.

15) DPA was subject to required data reporting to FNS, and DOH provided copies of these reports to the plaintiffs' attorneys within two business days of submission to FNS.

16) Counsel for plaintiffs, counsel for defendants, and key DOH and DPA personnel met twice before October 6, 2023 and again twice later in the month to explore possible comprehensive settlement of this litigation, but those efforts were unsuccessful.

The original stay agreed to by the parties has now expired, and DPA respectfully requests that this court stay the case for an additional period to allow DPA to complete the process of amending its CAP with FNS to include timeliness benchmarks and metrics.

## VII. DPA WILL CONTINUE TO WORK DILLIGENTLY TO RESOLVE THE BACKLOG DURING THE STAY

Commissioner Hedberg and Director Etheridge are sincerely committed to resolving the SNAP backlog and getting eligible Alaskans their benefits on time. DPA has

been and will continue to work tirelessly to achieve that goal during the requested litigation stay.

DPA's primary challenge at this point is simply understaffing, which is a problem across both the public and private sectors in Alaska.[15] DPA needs more fully trained employees to fill out the ranks of their backlog and current work teams. At the current staffing level, they are not able to both clear backlog and keep current work current. Furthermore, the current work team and backlog work teams also cover all other benefits programs for the State (other than Medicaid) and cannot devote their time exclusively to SNAP without causing timeliness problems in other programs. This one touch approach to processing allows a worker to take all necessary actions on a case without need to put it back into the work cue for someone else to pick up the case and take the next step. This increases efficiency as well as reduces errors or the risk that the case will not reenter the cue as intended. Although DPA has approved overtime for all eligibility workers to work backlog cases, DPA is unwilling to require overtime—employee retention is just as important as recruitment, and mandatory overtime would be detrimental to morale. Similarly, with holidays approaching, DPA expects many employees to take time off, and being able to use accrued leave is another vital factor in employee morale.

DPA is doing its utmost to increase staffing. As of the date of filing, DPA has 59 total employees trained and qualified to process SNAP applications, is in the process of

---

[15]     Unlike staffing the VCC, this staffing problem is not subject to contracting. Federal regulations **require** applications to be processed by state workers. 7 CFR 272.4(a)(1).

recruiting for 27 more, and in the process of training 21 already hired but not yet ready to begin unsupervised work. This is in addition to other recruitment and training efforts for clerical and support staff who are also essential to efficient DPA operations. And DPA is also working creatively on how to decrease case processing times. For example, DPA is actively working on an online application portal, which is scheduled to go live at the end of December 2023.

DPA will continue all these efforts during the requested stay. During the prior six-month stay, DPA amply demonstrated that its commitment to resolving this situation is not litigation-driven. Extending the stay will not diminish DPA's dedicated efforts to clear the backlog and work SNAP applications on time.

## VIII. ARGUMENT

### A.    THE PRIMARY JURISDICTION DOCTRINE.

"Primary jurisdiction" is "a prudential doctrine that permits courts to determine that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch."[16] The doctrine is squarely on point where, as here, Congress has entrusted regulatory authority over a national program to an administrative agency, and that administrative agency is actively involved in the same matter as is before the Court. Further, in this circumstance, the stay would not needlessly

---

[16]     *Astiana v. Hain Celestial Group, Inc*., 783 F.3d 753, 760 (9th Cir. 2015) (internal quotations omitted).

delay resolution of this matter, and it would avoid the possibility of DOH being subject to conflicting orders from this Court and FNS.

According to Ninth Circuit precedent, a district court may stay pending litigation under the "primary jurisdiction" doctrine upon consideration of the following factors:

> (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration.[17]

## B. ALL FOUR FACTORS WEIGH IN FAVOR OF A LIMITED STAY.

It is clear that the issues before this Court are identical to the issues FNS is in the process of addressing in its CAP with DPA. It is clear that Congress has placed jurisdiction over state administration of SNAP benefits in FNS. It is clear that the SNAP Act subjects all state agencies participating in SNAP to FNS's comprehensive regulatory authority. And it is clear that determining how best to resolve the SNAP backlog requires both expertise and uniformity in administration, particularly here, where federal law gives FNS the discretion to prioritize among corrective actions and where federal law gives FNS the ability to waive certain requirements. FNS has unique expertise and authority to craft the resolution of this situation that it considers best, in light of the entire program administration within Alaska and nationwide. FNS also has unique experience in creating and enforcing corrective action plans across the nation.

---

[17] *Id.*

Case 3:23-cv-00044-SLG   Document 17   Filed 11/09/23   Page 21 of 28

This case is also particularly suitable for application of the primary jurisdiction doctrine due to the complexities and policy implications of the issues.[18] Although it may seem facially simple to require DPA to clear the backlog and process applications on time, the practical reality is much more complex. Despite its best efforts since the change in leadership almost a year ago, DPA simply does not have the capacity to *both* clear the backlog *and* process all new applications on time. Until DPA has more fully-trained eligibility technicians, DPA must balance their caseload between clearing backlog and timely processing new applications. How best to do that is a difficult policy question.

Another difficult policy question involves balancing swift processing of applications against the possibility of inaccurate decisions or inaccurate benefit amounts.[19] FNS plays a unique role in that policy question through its power to waive requirements, such as the interview requirement. If FNS again chooses to waive the interview requirement, it may also choose to give DPA less time to clear the backlog since waiving interviews will lower case processing times. If FNS maintains the interview requirement, it may choose to give DPA more time to clear the backlog, understanding that case processing times will be higher.

How to measure the State's progress and compliance also involve complex policy choices. As explained above, different definitions of "timeliness" can result in wildly

---

[18]     *Id.* ( primary jurisdiction appropriate for case that "requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency.")

[19]     This balance affects the interests of the class, not just the State and FNS: inaccuracy can lead to eligible households being erroneously denied benefits, or issuance of a lower benefit than their entitlement. Inaccurately high benefit issuances can lead to clawback withholdings from future benefits. 7 CFR 273.18(a)(1)(i).

different results in measuring DOH's compliance. Further, different definitions of compliance can create different incentive structures and prioritization in how to approach backlog work versus current work.

Primary jurisdiction is also particularly suitable to apply in this case where FNS is actively and deeply engaged on the issue.[20] The Ninth Circuit has found primary jurisdiction applicable in cases involving much lower levels of agency engagement.[21] FNS's high level of engagement, and invocation of its authority to impose significant monetary penalties, clearly demonstrates that this motion to stay is no delay tactic.[22] FNS maintained high engagement over the course of the prior six month stay, including conducting two, in-person, week-long site visits to Alaska, collecting data on a weekly basis, and ultimately demanding Alaska clear the pre-April backlog on a much faster schedule than previously set in the CAP. There is no reason to believe that FNS will relax the pressure on DPA over the next six months.

Further, the Stay requested by the State would run for a *maximum* of six months. If the CAP is complete before six months have expired, the State will promptly notify the

---

[20]     *Id.* ("a court should not invoke primary jurisdiction when the agency is aware of but has expressed no interest in the subject matter of the litigation") *See also Robles v. Domino's Pizza, LLC,* 913 F.3d 898, 910 (9th Cir. 2019) (application of primary jurisdiction likely to lead to unnecessary delay where DOJ issued a regulation on the topic of litigation, but later withdrew it).

[21]     *See, e.g., Clark v. Time Warner Cable,* 523 F.3d 1110, 115 (9th Cir. 2008) (application of primary jurisdiction appropriate where agency issuance of Notice of Proposed Rulemaking "demonstrates that the agency is actively considering how it will regulate" the issue before the court); *Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc.,* 307 F.3d 775, 781 (9th Cir. 2002) (application of primary jurisdiction appropriate where parallel administrative remedy was available, although not yet invoked and "the particular contours of the administrative…remedy are not readily apparent").

[22]     *See Astiana,* 783 F.3d at 761 ("primary jurisdiction is not required when a referral to the agency would significantly postpone a ruling that a court is otherwise competent to make").

Court and file a copy of the final CAP, and the litigation may resume. The process of creating the original CAP took approximately two and a half months, however DPA expects a somewhat longer timeframe in this instance given that FNS asked the State to provide a significant quantity of data in advance that will take time for FNS to analyze, and given that key FNS personnel may be less available during the upcoming holiday season. Thus, the State's Motion to Stay is a meaningful request to streamline this litigation with the FNS CAP process, not a request for meaningless delay.

Finally, the touchstone for application of primary jurisdiction in the Ninth Circuit is efficiency, which would be well served by a stay here.[23] Litigation of the plaintiffs' preliminary injunction motion would cover all the same ground that FNS is already comprehensively covering. And this Court would have to decide the same questions that FNS is already deciding: how long should DPA have to come into compliance with SNAP Act application processing timelines, and what metrics to use to assess compliance?

If this Court invests significant time and resources into issuing an order, and FNS's CAP ultimately runs contrary to that order, the parties will immediately find themselves back before this Court on a motion to modify the prior order. DPA cannot be the servant of two masters in addressing the backlog, nor would it serve the interests of the class members to place DPA in that impossible position. The best outcome for the class members is an efficient, streamlined process to improve DOH's capacity for timely

---

[23] *Id.* at 760 ("efficiency is the deciding factor in whether to invoke primary jurisdiction") (internal quotations omitted).

application processing as smoothly as possible. It benefits no one to throw DOH into confusion. In a worst-case scenario, if this Court's remedies do not align with the CAP, it could force DPA to fall out of compliance with the CAP in order to comply with the Court's orders, or force DPA into contempt of court in order to comply with the CAP. Such a disaster would benefit no one, far less Alaskans waiting to get their SNAP benefits. The risk of conflicting orders from a court and an administrative agency is another purpose of the primary jurisdiction doctrine identified by the Ninth Circuit.[24]

### C.    A STAY WILL NOT PREJUDICE THE PLAINTIFFS.

This litigation is still in its early stages, when application of the doctrine can be most expeditious in avoiding unnecessary litigation.[25] This Court, and the parties, would benefit enormously from a completed CAP in litigating the preliminary injunction motion. Knowing what standards FNS will hold DPA to, how it will measure those standards, what specific steps it expects DPA to take to meet those standards, and what waivers FNS will allow, among other things, will greatly focus the litigation. It may be that the plaintiffs are satisfied with FNS's final CAP and no longer seek a separate preliminary injunction. And if the plaintiffs are not satisfied with the CAP, they can

---

[24]    *Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc.*, 307 F.3d 775, 780 (9th Cir. 2002) (describing primary jurisdiction as a "doctrine used by the court to allocate initial decision-making responsibility between agencies and courts where such jurisdictional overlaps and potential for conflicts exist") (internal quotations omitted).

[25]    *See, Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042 (9th Cir. 2000) (application of primary jurisdiction not appropriate where party moved to stay after the Court ruled on the central legal issue before the agency, and "staying the proceedings at that late date would hardly have enhanced the district court's efficiency, nor would it have taken advantage of the [agency's] expertise").

*Della Kamkoff et. al. v. Heidi Hedberg*
MOTION TO STAY

Case No. 3:23-cv-00044-SLG
Page 25 of 28

renew their preliminary injunction motion and be able to articulate why this Court should hold DOH to a different standard than that set by FNS. Waiting for a completed CAP would result in a much more efficient process for the parties and the court than litigating blind.

Plaintiffs advance language access claims related to Limited English Proficiency ("LEP") standards. DPA asserts that is has already complied with many of the specific requests and continues to make efforts at improvement. For the instant purpose, DPA does not believe that there will be any prejudice from including these issues in the stay. Litigation of all claims is consistent with the notion of judicial economy and more efficient for the parties due to the overlap of witnesses and testimony to fully litigate this related issue. No claim is impaired by inclusion of all pending matters in the stay.

In conclusion, this case is an ideal fit for the primary jurisdiction doctrine as articulated by the Ninth Circuit.[26] Application of the doctrine would promote efficiency, allow this Court to take advantage of the FNS process, and avoid the risk of conflicting decisions.[27] This Court should stay this case for a maximum of six months to allow time for FNS to conclude its process of updating DPA's CAP to "to set benchmark(s)" for timely application processing "and associated timeframes for improvement."

---

[26] *See Astiana*, 783 F.3d at 759-761.

[27] *See Syntek Semiconductor*, 307 F.3d at 780.

## IX.    CONCLUSION

This case is unusual in that both DPA and the plaintiffs share the goal of getting eligible Alaskans timely access to the benefits to which they are entitled. Resolving the SNAP backlog has been a priority of Commissioner Hedberg's since her appointment. Director Etheridge took the position of DPA Director on the understanding that it would be her job to resolve the backlog. During the six-month stay agreed to by the parties, DPA demonstrated many successes and did not relax its efforts to resolve the backlog. And DPA will continue to be committed to those efforts during the requested six-month stay.

And FNS's involvement directly affected this case, even during that short six-month stay. When DOH entered into the stipulation to stay in May, it agreed to reduce the backlog by 50% in six months, tracking its commitment to FNS to reduce the backlog by 3% week-over-week. But when FNS changed its approach to balancing backlog work versus current work over the summer, DOH had to follow FNS's direction. So, although DOH far exceeded the commitment that it made in the stipulation to stay to clear the then-existing backlog, DOH accumulated a new backlog that was not contemplated in the stipulation to stay. That situation clearly demonstrates how FNS's parallel process can directly affect this lawsuit.

This Court should treat FNS's involvement as a benefit to this case, rather than a complication. FNS is already deeply engaged on the issues to come before this Court, including how and when DPA reports data, how to quantify DPA's timeliness, and whether DPA is really making all reasonable efforts to improve its timeliness. And FNS

has unique expertise and authority, including the power to waive certain requirements and the power to withhold administrative funding. This Court should allow this litigation to benefit from that ongoing process, not recreate it, in a worst-case scenario, undermine it.

This Court should grant the State's motion and stay this case for a maximum of six months or until finalization of the FNS CAP.

DATED: November 9, 2023.    TREG TAYLOR
ATTORNEY GENERAL

By:    /s/*Lael A. Harrison*
Lael A. Harrison
Alaska Bar No. 0811093
Assistant Attorney General
Alaska Department of Law

By:    /s/*Justin D. Nelson*
Justin D. Nelson
Alaska Bar No. 1102007
Assistant Attorney General
Alaska Department of Law

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2023, true and correct copies of the foregoing Motion for Stay, Affidavit of Deb Etheridge, Affidavit of Tracie Dablemont, Proposed Order, and Exhibits were served on the parties via the CMECF electronic filing system.

/s/Justin D. Nelson
Assistant Attorney General