STEPHEN J. COX
ATTORNEY GENERAL

Lael A. Harrison (Alaska Bar No. 0811093)
Senior Assistant Attorney General
Department of Law
PO Box 110300
Juneau, AK 99811-300
Telephone: (907) 465-3600
Facsimile: (907) 465-2539
Email: lael.harrison@alaska.gov

Justin D. Nelson (Alaska Bar No. 1102007)
Senior Assistant Attorney General
Alaska Department of Law
100 Cushman Street, Suite 400
Fairbanks, AK 99701
Telephone: (907) 451-2811
Facsimile: (907) 451-2985
Email: justin.nelson@alaska.gov
Email: Fai.law.ecf@alaska.gov

David Wilkinson (Alaska Bar No. 1211136)
Senior Assistant Attorney General
Alaska Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-6612
Facsimile: (907) 258-4978
Email:  david.wilkinson@alaska.gov

*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| John Andrew, Kayla Birch, Rose Carney, Tereresa Ferguson, Zoya Jenkins, Troy Fender, Rhonda Conover, Autumn Ellanna, and Nataliia Moroz, on behalf of themselves, and all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Heidi Hedberg, in her official capacity as Commissioner of the Alaska Department of Health,<br><br>Defendant. | ) | Case No.: 3:23-cv-00044-SLG |

**REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ORAL ARGUMENT REQUESTED)**

## I. Introduction

The United States Supreme Court made clear in *Medina* that statutes confer individually enforceable rights only when they meet a "stringent" and "demanding" test.[1] The SNAP Act's state plan provisions lack the clear and unambiguous rights-creating language and unmistakable focus on individuals like the plaintiffs needed to meet that test.[2] The plaintiffs argue that the provisions contain "mandatory and individual-centric

---

1 *Medina v. Planned Parenthood South Atlantic*, 606 U.S. ---, 145 S.Ct. 2219, 2229 (2025).

2 *See* 7 U.S.C. § 2020(e)(2)(B), (e)(3), (4), (9), (10).

text."[3] But the Supreme Court rejected that approach and explained that using "'compulsory' and 'individual-centric terminology'" as the standard "would risk obliterating the longstanding line between mere benefits and enforceable rights."[4] The plaintiffs also rely on caselaw that applied the now-abrogated *Blessing* test.[5] This Court must analyze the relevant provisions of the SNAP Act directly under *Medina*'s clarified standard—when it does, the Court will see that the provisions fall far short of creating enforceable rights. These unremarkable administrative requirements for state plans are not the kind of "rare" and "especially unlikely" spending-power statutes that can be enforced by private lawsuits.[6]

## II. Statutory Interpretation

The plaintiffs argue that nothing changed with *Medina*, that it "simply reiterated" the existing standard.[7] But if *Medina* is not a change in the law, it is a major course correction. In *Medina*, the Supreme Court explicitly abrogated three of its prior decisions and implicitly abrogated a broad swath of lower court precedent that relied on them. This Court—and all courts deciding the application of 42 U.S.C. § 1983 to spending clause

---

[3] Plaintiffs' Opposition to Defendants' Motion for Summary Judgment re: Private Rights of Action, dkt. 115 (October 17, 2025) ("Opposition") at 9.

[4] *Medina*, 145 S.Ct. at 2236-38.

[5] Opposition at 18-22.

[6] *Medina*, 145 S.Ct. at 2230.

[7] Opposition at 3.

legislation—cannot simply rely on past precedent to guide it. This Court must analyze the relevant statutes directly against the standards set in *Medina*. And this Court must critically analyze past cases in light of *Medina* before relying on them. Here, the various provisions of 7 U.S.C. § 2020(e) on which the plaintiffs base their claims do not create private rights of action under the *Medina* standard. And past cases applying § 1983 to those provisions are no longer reliable.

To prove that a statute creates an enforceable right, *Medina* requires a plaintiff to show two elements: first, "that the law in question clearly and unambiguously uses rights-creating terms," and second, that it "display[s] an unmistakable focus on individuals like the plaintiff."[8]

The plaintiffs fail to identify any "clear and unambiguous rights-creating language"[9] in the provisions of § 2020(e) on which they rely. They admit that the provisions do not use the word "right," asserting that a statute does not necessarily have to use the magic word "right" in order to create an enforceable right.[10] But the plaintiffs do not identify any other language in the provisions that does so. Mandatory and individual-centric language is not enough: the statute must use clear and unambiguous

---

8 *Medina*, S.Ct. 145 at 2229 (Citations omitted, cleaned up).

9 *Id.* at 2236.

10 Opposition at 12.

rights-creating terms and display an unmistakable focus on individuals like the plaintiffs.[11] The cited provisions of §2020(e) do not.

In addition, the statute must display an unmistakable focus on individuals like the plaintiffs. The primary focus of these provisions is on the *state agency* administering SNAP benefits. Section 2020 is titled "administration" and subsection (e) is titled "Requisites of State plan of operation." Subsections (e)(3), (4) and (9) are all detailed instructions to the state agency of how to process applications. Subsection (e)(3), for example, is a 214-word, run-on sentence (including two parentheticals) primarily concerned with what information the State must verify when processing a SNAP application. The thirty-day processing timeframe is buried in the middle. The section is quoted in full below with the relevant timeframe language emphasized:

> The State plan of operation required under subsection (d) of this section shall provide, among such other provisions as may be required by regulation… (e) that the State agency shall thereafter promptly determine the eligibility of each applicant household by way of verification of income other than that determined to be excluded by section 2014(d) of this title (in part through the use of the information, if any, obtained under section 2025(e) of this title and after compliance with the requirement specified in paragraph (24)), household size (in any case such size is questionable), and such other eligibility factors as the Secretary determines to be necessary to implement sections 2014 and 2015 of this title, although the State agency may verify prior to certification, whether questionable or not, the size of any applicant household and such other eligibility factors as the State agency determines are necessary, so as to complete certification of and provide

---

[11] *Medina*, 145 S.Ct. at 2236 ("both speak in mandatory terms…. Both discuss 'individual[s].' Neither mentions 'rights'…. Neither paragraph uses clear and unambiguous rights-creating language, so neither supports a private suit under § 1983.").

> an allotment retroactive to the period of application to any eligible household **not later than thirty days** following its filing of an application, and that the State agency shall provide each applicant household, at the time of application, a clear written statement explaining what acts the household must perform to cooperate in obtaining verification and otherwise completing the application process[.]

This provision, in total, does not display an unmistakable focus on individuals like the plaintiffs. Its unmistakable focus is on the process state agencies should use when determining SNAP eligibility. Subsections (e)(4) (regarding recertifications) and (e)(9) (regarding expedited applications) are similar, except that subsection (e)(9) is somewhat shorter and mercifully divided into subparagraphs. Subsection (e)(2)(A), on which the plaintiffs rely for their first-contact-filing claim, is also unmistakably focused on state agency procedures.[12]

Direct comparison of these sections of § 2020(e) to the statutory provisions at issue in *Medina* shows almost exact similarity in structure and terminology. The provision in *Medina* addressed requirements for an approved state plan to participate in a federal benefit program.[13] Section 2020(e) is the same. The provision in *Medina* was not set apart from other state plan requirements.[14] The subsections of § 2020(e) here are the

---

12 It begins with the requirement "that the State agency shall establish procedures…" 7 U.S.C. § 2020(e)(2)(A) and (B).

13 *Medina*, 145 S.Ct. at 2236.

14 *Id.*

same. The provision in *Medina* used mandatory language.[15] These subsections of § 2020(e) do as well. The provision in *Medina* referred directly to individual Medicaid recipients.[16] The subsections of § 2020(e) here refer directly to eligible households. And, like the provision in *Medina*, none uses the word "right" or any other language clearly and unambiguously creating a right.[17]

Rather than addressing *Medina* head-on, the plaintiffs focus on the Supreme Court's precedent in *Talevski*[18] and *Gonzaga*,[19] which were reaffirmed in *Medina*.[20] The plaintiffs then concoct from them the same standard as the *Medina* dissenters proposed: that the combination of individual-centric and mandatory language, plus "language classically associated with establishing rights," is sufficient to create a privately enforceable right.[21] The Supreme Court majority was frankly dismissive of that conclusion: "If, as the dissent says, [the statute] creates an enforceable right because it

---

15 *Id.* The plaintiffs argue that the *Medina* statute did not use mandatory language (Opposition at 11), but the Supreme Court clearly interpreted it that way, stating "state Medicaid plans must allow individuals to obtain care from any qualified provider." *Medina*, 145 S.Ct. at 2235. The court also compared it to another subsection of the same statute and concluded, "Both speak in mandatory terms." *Id.* at 2236.

16 *Id.*

17 *Id.* The plaintiffs also point out that the statute in *Medina* required only "substantial compliance," but forget that § 2020 is similarly qualified, authorizing enforcement actions only for violations "without good cause." 7 U.S.C. § 2020(g).

18 *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166 (2023).

19 *Gonzaga University v. Doe*, 536 U.S. 273 (2002).

20 *Medina*, 145 S.Ct. at 2234.

21 *Id.* at 2237.

contains 'compulsory' and 'individual-centric terminology' plus an iffy analogy to the Bill of Rights, then many other provisions (in Medicaid and elsewhere) previously thought to confer only benefits would suddenly create rights instead."[22]

Yet that is precisely the plaintiffs' analysis: compulsory and individual-centric terminology, and an iffy analogy to the First Amendment.[23] The First Amendment has nothing in common with any of the provisions of § 2020(e) at issue. The plaintiffs point out that neither § 2020(e) nor the First Amendment's free exercise and freedom of speech clauses use the word "right."[24] But that is as far as the comparison can go. The provisions of § 2020(e) do not use language akin to "free exercise" or "freedom." Section 2020(e) sets out "[r]equisites of State plan of operation," using phrases like "the State agency shall thereafter promptly determine the eligibility of each applicant household," "shall insure that each participating household receive a notice of expiration," "provide benefits," and "shall establish procedures . . . that the State agency determines best serve households in the State."[25] The plaintiffs' First Amendment analogy is far weaker than

---

22 *Id.* at 2238.

23 Opposition at 13.

24 *Id.* Of course, the First Amendment does use the word "right" in describing "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

25 7 U.S.C. § 2020(e)(3), (4), (9), (2)(A).

the one rejected in *Medina*. There at least the relevant section of the Medicaid Act was enacted (but not codified) under a title that used the phrase "free choice."[26]

The plaintiffs do not meaningfully engage with *Talevski*, either. In *Talevski*, the question was whether a plaintiff could sue over the chemical restraint and discharge of their family member at a nursing home.[27] The statute in question read:

> (c) Requirements relating to residents' **rights**
> (1) General **rights**
> (A) Specified **rights**. A nursing facility must protect and promote the **rights** of each resident, including each of the following **rights**:
> …
> (ii) Free from restraints
> The **right** to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the resident's medical symptoms….
> (2) Transfer and discharge **rights**
> (A) In general
> A nursing facility must permit each resident to remain in the facility and must not transfer or discharge the resident from the facility unless….[28]

In all, the full statute uses the word "right" thirty-eight times, including the quoted sections sought to be enforced in *Talevski*. In contrast, § 2020(e) uses the word "right" once,[29] and not in any of the subsections the plaintiffs seek to enforce. Simply put, the statute in *Talevski* was unmistakably about rights. Section 2020(e) is not.

---

[26] *Medina*, 145 S.Ct. at 2237-38.

[27] *Talveski*, 599 U.S. at 174.

[28] 42 U.S.C. § 1396r(c) (emphasis added).

[29] 7 U.S.C. § 2020(e)(2)(C)(iii) (providing that a state's telephonic signature system "shall . . . not deny or interfere with the right of the household to apply in writing").

The other provisions of the SNAP Act that the plaintiffs cite are irrelevant and do not change the analysis. Section 2020(a)(3)(B)(ii) requires that agency records "be available for review in any action filed by a household to enforce any provision of this chapter (including regulations issued under this chapter)." Here, "this chapter" refers to the entire SNAP Act (Chapter 51 of Title 7 of the United States Code), which encompasses 7 U.S.C. §§ 2011-2036d. These statutes cover diverse topics including eligibility for benefits,[30] the value of SNAP allotments,[31] disqualification and penalties for household violations,[32] and special topics like workfare[33] and obesity prevention grants.[34] The records retention provision in § 2020(a)(3)(B)(ii) cannot be read to make every provision of the SNAP Act and all related regulations privately enforceable under § 1983. Nor does it suggest that any specific subsections of § 2020(e) create enforceable rights. This records retention provision sheds no light on which rare provisions of the SNAP Act, if any, create enforceable rights.[35]

---

30 7 U.S.C. § 2014.

31 7 U.S.C. § 2017.

32 7 U.S.C. § 2024.

33 7 U.S.C. § 2029.

34 7 U.S.C. § 2036.

35 One district court referenced this provision in support of finding an enforceable right in a different statute, 7 U.S.C. § 2014. *Barry v. Corrigan*, 79 F.Supp.3d 712, 735 (E.D. Mich. 2015). That statute governs eligibility standards for SNAP benefits, and plaintiffs sued to challenge a Michigan law that disqualified households for benefits allegedly contrary to 7 U.S.C. § 2014. *Id.* at 722. But determining whether the Act created a cause of action to enforce eligibility requirements is a very different question

Section 2023(b) is also irrelevant. It creates a one-year statute of limitations for restoration of "wrongfully withheld" benefits.[36] This section has no relevance to claims for declaratory and injunctive relief like this one.

Finally, the plaintiffs cite § 2027(a)(2), which prohibits using SNAP appropriations "to interfere with or impede the implementation of any provision of this chapter," but allows funds to be used for legal assistance in administrative or judicial proceedings. The plaintiffs are truly grasping at straws with this citation. That statute has no bearing on this case. Congress enacted it in response to a very specific historical circumstance, and no court has had occasion to interpret it. After Congress amended the SNAP Act to create a controversial "workfare" program, various nonprofit advocacy groups apparently advised constituents about how to thwart its implementation, including through civil disobedience.[37] Some of those advocacy groups received federal grant

---

than whether the Act created a private cause of action to enforce administrative state plan provisions. Furthermore, that case should be viewed with caution as it applies the *Blessing* test and also relies on *Harris v. Olszewski*, which reached the exact opposite holding to *Medina. Id.* at 736 (citing *Harris v. Olszewski*, 442 F.3d 456, 461 (6th Cir. 2006)); *see Medina*, 145 S.Ct. at 2255 n.7 (Jackson, J., dissenting).

[36] 7 U.S.C. § 2023(b) reads: "In any judicial action arising under this chapter, any allotments found to have been wrongfully withheld shall be restored only for periods of not more than one year prior to the date of the commencement of such action, or in the case of an action seeking review of a final State agency determination, not more than one year prior to the date of the filing of a request with the State for the restoration of such allotments or, in either case, not more than one year prior to the date the State agency is notified or otherwise discovers the possible loss to a household.").

[37] H. Report No. 96-788, 96th C., 2d Sess. 143-4 (1980) ("It has come to the Committee's attention that various groups allegedly representing the interests of recipients of benefits under the Act and operating with the aid of federal funds (whether

funding.[38] Section 2027(a)(2) was intended to prevent federal grant funding from going towards organized efforts to thwart the workfare program.[39] But Congress deliberately exempted provision of legal advice or representation from that prohibition.[40] The provision is totally irrelevant to whether SNAP application processing timeframes are privately enforceable.

The plaintiffs also argue that nothing in the SNAP Act displaces application of § 1983.[41] But courts only consider that question *after* finding that a statute clearly and unmistakably creates a right.[42] The *Medina* court did not reach that question because it did not find that the statutory language created a right.[43] This Court also need not consider it because these subsections of § 2020(e) do not create rights.

---

or not flowing from the Act) have attempted to interfere with or impede the implementation of parts of the Act that they find distasteful.").

38 *Id.*

39 *Id.*

40 *Id.* ("This Committee has no quarrel at all—and could not under the First Amendment—with any organization's right, with the aid of federal funds… to represent participants as clients in court or before an administrative agency or department, be it federal or state or local, or to advise recipients of their rights or obligations under the Act and consult with them prior to any legal proceedings or action…. The Committee does not, however, want federal funds employed to finance illegal non-First Amendment-covered activities that intentionally seek to prevent or block or impede the implementation of legislation.").

41 Opposition at 22.

42 *Medina*, 145 S.Ct. at 2234, n.6.

43 *Id.*

But the plaintiffs' argument also suffers from a real-life problem because their lawsuit conflicts with the ongoing enforcement process Congress created in § 2020(g). The plaintiffs want this Court to impose different priorities on DOH than FNS has done in its corrective action plan ("CAP"). In *Medina*, the Court explained: "there was a time in the mid-20th century when the Court assumed it to be a proper judicial function to provide whatever remedies it deemed necessary to make effective a statute's purpose. But, as this Court has since come to appreciate, no statute pursues any single purpose at all costs."[44] FNS has chosen to implement a CAP that balances the goal of speedy application processing against other goals such as accuracy and quality control.[45] The plaintiffs want this Court to displace FNS's actual enforcement process and prioritize speed of application processing over all other considerations. So, even if the text of § 2020(e)'s timeliness provisions created rights (which they do not), as a practical matter it is clear this private lawsuit to enforce them is incompatible with the enforcement process created by Congress in § 2020(g).

## III. Precedent

The plaintiffs argue that caselaw finding private causes of action to enforce the timeliness provisions of § 2020(e) remain good law after *Medina*. But those cases did not

---

44 *Id.* at 2229 (cleaned up, internal quotations omitted).

45 The timeliness CAP is not FNS's only enforcement action against DOH, and FNS recently fined DOH millions of dollars for payment error rates. Attachment 1 to Report On Compliance with Court-Ordered Requirements, Dkt. 100-2 (July 31, 2025); Exhibit B to Defendant's Motion for Summary Judgment, Dkt. 102 (Sept. 2, 2025).

apply the *Medina* standard, they did not look for or find unambiguous rights-creating language coupled with an unmistakable focus on individuals like the plaintiffs. Instead, they applied the now abrogated *Blessing v. Freestone* test (and found the question to be close even under that impermissibly generous standard). Those cases are no longer reliable precedent.

The plaintiffs primarily look to *Briggs v. Bremby*, which applied the three factor *Blessing* test rejected in *Medina*.[46] The first factor of that test was that "Congress must have intended that the provision in question benefit the plaintiff."[47] Merely benefiting a plaintiff is a much weaker formulation than *Medina*'s requirement that the statute "display an *unmistakable focus* on individuals like the plaintiff."[48] The *Briggs* court struggled with even the weaker formulation.[49] In order to resolve it in favor of the plaintiffs, the *Briggs* court looked first to *Wright v. City of Roanoke*, also abrogated in *Medina*.[50] The court noted that the Supreme Court found that the statute at issue in *Wright* benefited individuals "despite the fact that the statute was directed at government

---

46 792 F.3d 239, 242 (2d. Cir. 2015) (citing *Blessing v. Freestone*, 520 U.S. 329 (1997)); *Medina*, 145 S.Ct. at 2233-34.

47 *Briggs*, 792 F.3d at 242 (citing *Blessing*, 520 at 340-41).

48 *Medina*, 145 S.Ct. at 2229 (emphasis added).

49 *Briggs,* 792 F.3d at 242 ("Whether congress intended these provisions to benefit food stamp applicants, as the first *Blessing* prong requires, justifies a bit more discussion.").

50 *Id.* (citing *Wright v. City of Roanoke Redevelopment & Housing Auth*., 479 U.S. 418 (1987)); *Medina*, 145 S.Ct. at 2233-34.

agencies."[51] The *Briggs* court then looked to *Wilder v. Virginia Hospital Association*, another case abrogated in *Medina*,[52] and explained:

> This provision was explicitly directed at government actors. It referred to the requires of the "State plan" and the procedures and policies developed by the "State." Nonetheless, the Court found that its terms were individually enforceable through private lawsuits.[53]

The *Briggs* court briefly considered *Gonzaga*, which *Medina* reaffirmed as good law,[54] but did not rely on it: "Nor does *Gonzaga* undercut the applicability of *Wright* and *Wilder* to the case before us."[55] If the *Briggs* court had the benefit of *Medina*, and not relied on *Wright* and *Wilder*, it would never have reached the conclusion that it did.

In fact, *Medina* itself casts doubt on the continuing viability of *Briggs*. *Medina* favorably cited the United States amicus brief as offering examples of statutes that courts have found create rights despite lacking clear and unambiguous rights-creating language.[56] One of those examples offered by the United States was § 2020(e) and *Briggs v. Bremby.*[57]

---

51 *Briggs*, 792 F.3d at 243.

52 *Medina*, 145 S.Ct. at 2233-34.

53 *Briggs*, 792 F.3d at 243 (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990)).

54 *Medina*, 145 S.Ct. at 2234.

55 *Briggs*, 792 F.3d at 244 (citing *Gonzaga University v. Doe*, 536 U.S. 273 (2002)).

56 *Medina*, 145 S.Ct. at 2236.

57 Brief of the United States as Amicus Curiae Supporting Petitioner, 2025 WL 496923, at 29 (Feb. 10, 2025).

Another example the United States cited in its amicus brief was the Ninth Circuit case of *ASW v. Oregon*, which found a private cause of action to enforce the Child Welfare Act.[58] In their opposition brief, the plaintiffs cite *Henry A. v. Willden*, which relied heavily on and reached the same holding as *ASW*.[59] *Henry A.* should no longer be considered good precedent because it applies the *Blessing* test. But, in any case, the Child Welfare Act contains unique terms not present in the SNAP Act and therefore requires a different analysis.[60]

The plaintiffs also reference *Garnett v. Zeilinger*, which followed a similar pattern to *Briggs*.[61] There, the district court also applied the three-factor *Blessing* test and looked to *Wilder* and *Wright* to resolve the first factor in the plaintiffs' favor. "The hardest prong of the *Blessing* test here," the court wrote, "is the first: whether the statutory text creates rights that are intended to benefit *individuals*."[62] The Court noted that "the relevant statutory language focuses on the State plan of operation, not on the individual beneficiaries of SNAP."[63] Like the *Briggs* court, *Garnett* looked to *Wilder* and *Wright* for

---

58 *Id.* (citing *ASW v. Oregon*, 424 F.3d 970, 974 (9th Cir. 2005)).

59 Opposition at 10, n.37 (citing *Henry A. v. Willden*, 678 F.3d 991, 1007 (9th Cir. 2012)).

60 *See Henry A.*, 678 F.3d at 1007 (citing 42 U.S.C. § 1320a-2).

61 *Garnett v. Zeilinger*, 323 F.Supp.3d 58 (D.D.C. 2018).

62 *Id.* at 72 (emphasis in original).

63 *Id.*

guidance,[64] and found that *Gonzaga* "does not require a contrary result."[65] Again, had the district court been looking for an "unmistakable focus on individuals like the plaintiff" rather than simply an "inten[t] that the provision in question benefit the plaintiff," and known not to rely on *Wilder* or *Wright*, it would have reached a different conclusion.[66]

## IV. Regulations

The regulations that the plaintiffs cite do not affect the analysis.[67] They are irrelevant to the statutory interpretation, and even if they could be relevant, they do not suggest the existence of a private right of action to enforce these provisions.

*Medina* and *Talveski* do not discuss regulations at all, despite the existence of regulations interpreting the statutes at issue in those cases.[68] So the Supreme Court does not consider regulations to be relevant when determining the existence of a cause of action.

---

64 *Id.*

65 *Id.* at 74.

66 The plaintiffs also look to *Willison v. Eggleston*, which struggled with the question of how to reconcile *Blessing* and *Gonzaga. Williston v. Eggleston*, 379 F.Supp.2d 561, 574 (S.D.N.Y. 2005). Ultimately, that district court looked to other decisions applying the *Blessing* test to find a cause of action to enforce the SNAP Act's first-contact-filing provision and relied on *Gonzaga* only for the question of whether Congress had specifically foreclosed a § 1983 remedy. *Id.* at 576.

67 In their opposition brief, the plaintiffs clarify that they are not suing to enforce the regulations directly, only § 2020(e). Opposition at 28.

68 *See* 42 C.F.R. § 431.51; 42 C.F.R. § 483.10.

Even if regulations could be relevant to the analysis, they do not leave room for the existence of a private cause of action. The extensive provisions for federal enforcement through corrective action plans do not account for any kind of parallel private enforcement proceedings.[69] Similarly, FNS's authority to waive administrative requirements cannot be squared with a private cause of action to enforce those administrative requirements.[70] The regulations that the plaintiffs cite are not to the contrary. The regulation requiring states to notify FNS of pending litigation about "any matter which involves the State agency's administration of SNAP"[71] does not suggest that FNS believes that there is a valid cause of action to sue over "any matter which involves [a] State agency's administration of SNAP." FNS simply wants to know about any ongoing litigation—meritorious or not.

## V. Delay Notice

In their opposition brief, the plaintiffs clarify for the first time that their demand that the State send a notice of delay to all households after thirty or seven days arises under § 2020(e)(10)—not under 7 C.F.R. § 273.10(g)(1)(iii).[72] But § 2020(e)(10) does not say anything about a delay notice.[73] Far from using clear and unambiguous terms

---

69 *See, e.g.*, 7 C.F.R. §§ 275.3, 275.16, 276.5, 276.4(d).

70 7 C.F.R. § 272.3.

71 7 C.F.R. § 272.4(d)(1)(i).

72 Opposition at 28.

73 It requires that State plans contain provisions "for the granting of a fair hearing and a prompt determination thereafter to any household aggrieved by the action of the

creating a right to a notice, it makes no mention of any notices, far less in cases of agency delay. The plaintiffs previously argued, and this Court held, that § 2020(e)(10) requires states to provide a fair hearing in event of agency delay, but never that it requires states to send out a *notice* of agency delay.[74] Only the regulation addresses notices of agency delay.[75]

This Court should grant the State's motion for summary judgment on the plaintiffs' notice of delay claim not only because § 2020(e)(10) does not contain clear and unambiguous rights-creating language but because it does not require the State to send a delay notice at all.

## VI. Policy

The plaintiffs put forward the same policy argument that the Supreme Court rejected in *Medina*. The *Medina* court explicitly rejected the policy argument that "[o]nly § 1983 litigation…can give the . . . provision the teeth it needs."[76] This is true for the SNAP Act just as it was for the Medicaid Act provision in *Medina*. "Without this lawsuit," the plaintiffs assert, "there is no telling how much worse Defendant's SNAP

---

State agency under any provision of its plan of operation as it affects the participation of such household in the supplemental nutrition assistance program or by a claim against the household for an overissuance."

[74] Order Re Motion for Preliminary Injunction, Dkt. 77 (Dec. 31, 2024) at 18-19. The state continues to dispute this ruling.

[75] 7 C.F.R. § 273.2(h).

[76] *Medina*, 145 S.Ct. at 2238.

process would get."[77] Of course, the plaintiffs dismiss the CAP and FNS oversight out of hand, without so much as acknowledging its existence.

In *Medina*, the federal government had apparently taken no action to enforce the Medicaid Act provision the state. Yet the Court still emphasized that "[i]f existing remedies prove insufficient, Congress can create new ones."[78] The Court's reasoning is all the more persuasive here, where the federal government is actively involved in overseeing DOH's operations and enforcing compliance with the Act.

The *Medina* court also admonished the plaintiffs and dissenters for failing to recognize the existence of a state administrative process capable of providing relief.[79] The plaintiffs here likewise brush aside the importance of administrative relief. The *Medina* court noted that a state administrative process allowed providers to challenge their exclusion from the state Medicaid program and concluded that "funding cutoffs may not be the only way to enforce" the statute.[80] This is analogous to DOH providing an opportunity for a fair hearing to any household whose SNAP application is delayed beyond statutory deadlines.[81] So not only is FNS actively engaged with DOH's application processing timeliness, individual households can seek relief directly from the

---

77 Opposition at 30.

78 *Medina*, 145 S.Ct. at 2239.

79 *Id.*

80 *Id.*

81 7 AAC 49.020.

State through a fair hearing. To hear the plaintiffs tell it, this lawsuit is the only thing keeping the wolf from Alaskans' doors,[82] but these federal and state proceedings protect the plaintiffs' interests even in the absence of a private cause of action.

Finally, the plaintiffs' facile arguments ignore the real-life complexities of this situation and only weaken their case. It is demonstrably wrong to claim that "Alaska…would rather drag its feet than feed its citizens."[83] Assertions like that are entirely unhelpful; they do nothing to advance the plaintiffs' position or resolve the legal dispute. DOH has been working independently and engaging with FNS to find solutions to this issue since before this lawsuit was filed.[84] And DOH continues to work with FNS on solutions that balance timeliness with FNS's various other priorities for SNAP administration in Alaska.[85] This is as it should be. Congress entrusted enforcement of the

---

[82] *Id.* at 30-31.

[83] Opposition at 30.

[84] *See* Exhibit A (FNS Letter to Commissioner Hedberg, dated February 9, 2023 and memorializing January 12, 2023 meeting between FNS and DOH and outlining DOH's proposed solutions); Alaska Senate Health and Social Services Committee Meeting, January 24, 2023, 3:30pm, minutes available online at https://www.akleg.gov/basis/Meeting/Detail?Meeting=SHSS%202023-01-24%2015:30:00#tab3_4, (starting at 4:01pm Commissioner Hedberg describes her efforts to identify solutions to the SNAP application backlog beginning in November, 2022), Class Action Complaint, Dkt. 1-1 (March 1, 2023) (file-stamped by Alaska Superior Court January 20, 2023).

[85] *See* Plaintiffs' Motion for Summary Judgment, Exhibit 28, dkt. 106-34 (Sept. 12, 2025).

relevant provisions of the SNAP Act to FNS alone. The Act gives the plaintiffs no private causes of action to circumvent that process.

## VII. Conclusion

This Court should grant the defendant summary judgment on all the plaintiffs' statutory claims.

DATED: November 7, 2025.

STEPHEN J. COX
ATTORNEY GENERAL

By: *<u>/s/Lael Harrison</u>*
Lael A. Harrison
Alaska Bar No. 0811093
David Wilkinson
Alaska Bar No. 1211136
Justin D. Nelson
Alaska Bar No. 1102007
Senior Assistant Attorneys General
Department of Law
Attorneys for Defendant

<u>Certificate of Service</u>
I certify that on November 7, 2025 the foregoing **Reply in Support of Defendant's Motion for Summary Judgment (Oral Argument Requested)** was served electronically on:

Goriune Dudukgian
Northern Justice Project
406 G Street, Suite 207
Anchorage, AK 99501
gdudukgian@njp-law.com

Nicholas Feronti
Northern Justice Project
406 G Street, Suite 207
Anchorage, AK 99501
nferonti@njp-law.com
CC all pleadings to:
Jim Davis - jdavis@njp-law.com

Saima Akhtar
National Center for Law and Economic Justice
50 Broadway, Suite 1500
New York, NY 10004
akhtar@nclej.org

Margaret D. Craig
DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, MA 02110-1447
maggie.craig@us.dlapiper.com

Kelsey Tavares
DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, MA 02110-1447
kelsey.tavares@us.dlapiper.com

Christopher M. Young
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101-4297
christopher.young@dlapiper.com

Sean P. Fulton
DLA Piper LLP (US)
1900 N. Pearl Street, Suite 2200
Dallas, TX 75201-2482
sean.fulton@us.dlapiper.com

Constance I. Du
DLA Piper LLP (US)
444 W Lake Street, Suite 900
Chicago, IL 60606-0010
constance.du@us.dlapiper.com

*/s/Lael Harrison*
Lael A. Harrison, Assistant Attorney General

*/s/Justin Nelson*
Justin D. Nelson, Assistant Attorney General

*/s/David Wilkinson*
David Wilkinson, Assistant Attorney General